UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MATTHEW MCGUIRE,

      Plaintiff,

vs.

      Case No.10-cv-10553
      HON. GEORGE CARAM STEEH

STATE OF MICHIGAN DEPARTMENT OF
COMMUNITY MENTAL HEALTH, *et al.*,

      Defendants.

_____/

## ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DISMISSING ACTION

### I.   Introduction

Plaintiff filed the instant 42 U.S.C. § 1983 action against defendants Michigan Department of Community Health, the Mount Pleasant Center (MPC), Resident Care Aids (RCAs) Gary Sheets, Roosevelt Abraham, Michael Borie, Matthew Hassenger, Mark Cooper, and Kenneth Longton, as well as, Cynthia Kelly, Director of Hospital and Center Operations, and Price Pullins, Acting Director of the MPC.[1] Plaintiff claims that defendants violated his Fourteenth Amendment rights[2] and committed various state law torts against

---

[1] On April 5, 2011, the parties stipulated to the dismissal of defendants State of Michigan Department of Community Health, the MPC and Kenneth Longton. *See* Dkt. No. 69.

[2] In the complaint, plaintiff asserts violations under the Fourth and Eighth Amendments, however during the relevant time period plaintiff was a pre-trial detainee,

him while he was a patient at the MPC from October 26, 2006 through July 21, 2009. Defendants now move for summary judgment based on the doctrine of qualified immunity. The parties have fully briefed their respective positions and oral argument was held on August 15, 2011. For the reasons that follow, the court grants defendants' motion for summary judgment.

## II. Factual Background

Plaintiff, Matthew McGuire, is a developmentally disabled person who has been in special education classes since the age of eighteen months through the age of twenty-six. He performs in the "mildly mentally retarded range with both verbal and nonverbal abilities" and is autistic. His intelligence tests scores range from 48 to 72. *See* Defs.' Mot. for Summ. J., Ex. A at 5. He also has a history of inpatient treatment secondary to suicidal ideation and assaultive behavior dating back to the age of eight. *Id.*, Ex. B. He has carried a diagnosis of some form of mental illness for many years, including schizoaffective disorder, psychotic disorder NOS (not otherwise specified), and impulse control disorder NOS. At age 19, plaintiff's father, Robert McGuire, was appointed his legal guardian. *Id.*,

---

therefore the Fourteenth Amendment applies rather than the Fourth or Eighth Amendments. *See Aldini v. Johnson*, 609 F. 3d 858, 864 (6th Cir. 2010). The Fourth Amendment protects unreasonable seizures of persons arising "in the context of an arrest or investigatory stop of free citizen," while the Eighth Amendment protects convicted prisoners from the use of excessive force by their custodians. *Id.* (citing *Whitley v. Albers*, 475 U.S. 312, 318-22 (1986)). "When neither the Fourth nor the Eighth Amendment serves to protect citizens, courts have applied the Fourteenth Amendment." *Id.* The Fourteenth Amendment "protects a pretrial detainee from the use of excessive force that amounts to punishment." *Leary v. Livingston County*, 528 F. 3d 438, 443 (6th Cir. 2008). Additionally, claims by pretrial detainees of deliberate indifference are analyzed under the Fourteenth Amendment's Due Process Clause, rather than under the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 n. 16 (1979).

Ex. D.

On July 28, 2006, plaintiff left the group home where he resided and found three young girls (between the ages of 6 to 10 years old) playing outside. *Id.*, Ex. E. Plaintiff approached the girls, reached out his arms and said, "hey, you look sexy in that nice dress." *Id.* Plaintiff also told the girls that he wanted to kidnap them. *Id.* One of the girls managed to evade plaintiff's grasp by kicking him and screamed for help. *Id.* Another girl ran home and told her mother who called 911. *Id.* Officers arrived on the scene, plaintiff was arrested and placed in the back seat of the patrol car. *Id.* Plaintiff kicked in the rear driver's side door, damaging the door frame of the officer's car *Id.*

Plaintiff was charged with attempted kidnapping, child enticement, and two counts of accosting children for immoral purposes and malicious destruction of fire or police property in the 42-2 District Court, New Baltimore, Michigan. *Id.*, Ex. F. A licensed psychologist and consulting forensic examiner evaluated plaintiff and found that he was not competent to stand trial, and recommended he receive treatment at defendant Mount Pleasant Center. *Id.*, Ex. G. On August 7, 2006, Judge Paul A. Cassidy, found plaintiff incompetent to stand trial and ordered that plaintiff undergo treatment. *Id.*, Ex. H. On or about October 26, 2006, plaintiff was sent to the MPC on Chapter 10 Judicial Admission/IST status. *Id.*, Ex. B. Upon admission, plaintiff's priorities included, competency training due to the court ordered admission, and completion of activities of daily living (ADLs) each day. *Id.*, Ex. J.

The MPC was the last state operated intermediate care facility for individuals with developmental disabilities, and provides short-term, residential based support and services to those individuals until a viable community option is available. See Plf.'s Resp., Ex. 1.

While at the MPC, plaintiff would report hearing voices that would tell him to do things. From time to time, plaintiff would run out of his room or run through the hallways trying to escape from the MPC. On December 15, 2008, plaintiff's staffing team determined that for the health and safety of plaintiff and others, he would receive 2:1 supervision, meaning that two staff members were assigned to him at all times. *See* Defs.' Mot. for Summ. J., Ex. L. On February 18, 2009, plaintiff's level of supervision was increased to line-of-sight supervision by two staff members. *Id.* This required staff to maintain direct visual observation of plaintiff at all times.

Pursuant to MPC policy, the use of physical restraints or a physical hold on patients was considered to be a last resort after other less restrictive approaches have been unsuccessful. *Id*, Ex. GG at 2. However, during his stay at MPC, plaintiff was placed in physical restraints frequently. For instance, on August 5, 2007, plaintiff's progress notes reveal that he was placed in a physical hold after he attempted to choke a staff member and verbal redirection was unsuccessful. *Id.*, Ex. M. On October 25, 2007, plaintiff suddenly ran out of his room, and hit a staff member with his fist when he was apprehended. *Id.* After verbal redirection was not successful, he was placed in a physical restraint. *Id.* Plaintiff's progress notes show many instances where plaintiff was either a danger to himself, to other patients or to the staff at MPC. *Id.*

Several months after being placed at MPC, plaintiff began reporting to his father that he was being verbally and physically abused by staff at MPC. On February 20, 2008, plaintiff informed his father that an RCA, defendant Abraham, kicked him in the ribs. On that date plaintiff's progress notes show that he attempted to run out of his room twice, kicked at the staff, threw himself to the floor and began scratching his face. *See* Defs.' Mot.

-4-

for Summ. J., Ex. Q. Plaintiff was placed in two physical holds after verbal redirection was unsuccessful. *Id.* Plaintiff's father reported his son's complaint that an RCA kicked him in the ribs. The Office of Recipient Rights (ORR), the entity responsible for investigating allegations of abuse at MPC, conducted an investigation of the February 20, 2008 incident. *Id.,* Ex. P. The ORR investigation concluded that there was no "evidence to support" plaintiff's allegations. *Id.* The ORR investigation found that:

> Matt was not consistent with his story. He had stated initially that he had done the injuries to himself. Then when he was informed that he could not be moved to 609, he stated that Rosie [Abraham] had hit him. The following day when this advisor interviewed him he stated that Rosie had dragged him by his shirt and kicked him in the butt. On 2/29/08 when the P&A representative had visited Matt, he had stated that he had called Rosie a "dumb negro" and then Roosevelt had punched him several times in the face.
>
> All staff involved stated that Matt was upset and had slammed his head on the floor, which most likely caused the injuries.

*Id.* On April 28, 2008, plaintiff's father again contacted the MPC over his concerns that his son was being abused. Plaintiff told his father that staff were calling him names and that RCA Abraham had tried to push him into a laundry cart. *Id.* The ORR conducted a review of these allegations and again found no evidence to support plaintiff's complaints. *Id.* On July 10, 2008, plaintiff was again placed in physical restraint, "[p]hysical hold implemented x1 for 15 minutes, attempted to release; Aggressions continued resumed hold for an additional 15 minutes. As a last resort Matthew was placed in mechanical restraints per 815A, due to continued physical aggressions towards staff." *See* Plf.'s Mot. for Summ. J., Ex. 16. Between October 12, 2008 through November 22, 2008, plaintiff was placed in seventeen documented physical holds, and five documented five-point restraints. *Id.*, Ex. 17.

On November 5, 2008, plaintiff told his father that he had been punched in the groin by RCA Abraham. Plaintiff's father reported this to MPC staff and an investigation was conducted by ORR. *See* Defs.' Mot. for Summ. J., Ex. O. The ORR investigation concluded that:

> The statements of the staff witnesses and the records that they kept are consistent with each other and provide a reliable picture of what actually occurred on November 5, 2008. Based on all of this information, evidence supports that the recipient attempted to elude line of sight supervision and then became aggressive when prevented from leaving and therefore became involved in the physical management. Evidence also supports that RCA (RA) did not do anything inappropriate to the recipient.

*Id.* On nearly every day in November of 2008, plaintiff was placed in a physical hold. *Id.*, Ex. Q. The progress notes prepared by the staff indicate that in each instance that a physical hold was implemented, plaintiff was aggressive towards staff. *Id.*

On November 26, 2008, MPC staff noticed that plaintiff had a large amount of swelling and bruising to his left hip, leg and ankle. *Id.*, Ex. O. When plaintiff's father was informed of this, he told the staff that plaintiff had been complaining lately about RCA Abraham kicking him in the groin and other abusive things. *Id.* It is not clear from the record the result of this investigation. Over the next week, plaintiff's father made several calls to MPC stating that plaintiff kept complaining of physical abuse, including kicks to the ribs and chest. He asked that plaintiff be taken for x-rays, however plaintiff was only examined by a staff nurse who noted a raised area in plaintiff's "mid-left lower posterior ribs." *See* Plf.'s Resp., Ex. 18.

On December 12, 2008, plaintiff's father again requested that his son be taken to the hospital for a thorough medical examination. *Id.*, Ex. 19. A CT-scan revealed that plaintiff had several rib fractures on the right side of his body, and several on the left, in

various stages of healing. *Id.*, Ex. 20. Plaintiff's father filed a police report with the Mount Pleasant Police Department. On January 7, 2009, Detective Paul Lauria interviewed plaintiff. *Id.*, Ex. 21. Plaintiff identified Abraham, Borie, Hassenger, and Sheets as the RCAs who injured him. *Id.* Detective Lauria later spoke with defendant Pullins about plaintiff's claims. *Id.* It is unclear from the record the result of Lauria's investigation. While defendants claim that Lauria's investigation resulted in a finding that plaintiff's injuries were not caused by staff abuse, nothing in the record supports this assertion. *See* Defs.' Mot. for Summ. J., Ex. X. An ORR investigation concluded that: "Although the evidence supports that it is likely that the recipient's ribs were injured on several different occasions as a result of physical management, there is not a preponderance of evidence to identify any specific occasions, how the injuries occurred, or which staff if any was a participant in the incident that resulted in the rib injuries*. Id.*, Ex. O.

On February 17, 2009, plaintiff was given an emergency physical examination because he had a bruise on his upper right cheekbone, redness in his right eye, and a loose tooth in the upper front right of his mouth. *See* Plf.'s Mot. for Summ. J. Ex. 22. This tooth would later need to be extracted. *Id.* An ORR investigation concluded that there was no evidence to support that a staff person hit plaintiff. . . [t]he preponderance of the evidence supports that it is likely that the injury to the recipient's mid-upper lip, and the loose tooth that was observed about an hour and a half later, after a second physical hold, were the result of the recipient's own actions and not the result of a nonaccidental act on the part of staff." *Id.* Plaintiff was discharged from MPC to a group home in Washington, Michigan on July 21, 2009. The MPC closed in October of 2009.

Plaintiff directs the court's attention to the fact that the MPC has a history of neglect,

abuse and substandard care during the time that plaintiff was a resident there. Plaintiff relies on a January 11, 2007 United States Department of Health and Human Services report regarding its survey of MPC. This report identified various failures to abide by standards of care "to protect clients from abuse, ensure an environment that enhances the health and safety of each individual resulting in a potential for abuse and injury to reoccur and an unattractive living environment." *Id.,* Ex. 2 at 4. For instance, the report noted that two Resident Care Assistants (RCA) "with substantiated abuse were re-assigned to work with ICF/MR [intermediate care facility/mentally retarded] clients resulting in the potential for abuse to reoccur." *Id.* at 11. The MPC was also found to be deficient in its reporting "of allegations of abuse, neglect, mistreatment, and injuries of unknown origin. . . resulting in a potential for corrective actions not being identified in a timely manner." *Id.* at 23.

In April of 2007, Michigan's Office of the Auditor General conducted an audit of the MPC and uncovered similar deficiencies in the care provided at the MPC. *Id.*, Ex. 1. Specifically, during the audit period, "[t]hree critical incidents occurred at the Center that resulted in the injury and/or death of Center patients. These incidents involve either noncompliance with patient treatment plans, Center policies, or requirements of the Mental Health Code . . . ." *Id.* at 14.[3] The audit also reported that 84.4% of the RCAs reviewed

---

[3] One patient died from complications related to aspiration pneumonia because MPC staff fed the patient peanut butter. Id. at 15. The patient was not to receive peanut butter pursuant to MPC policy because he was on a mechanical soft food diet. Id. Another patient was found unconscious while taking a bath and later died. Id An autopsy revealed that the death was caused by a blunt force injury to the abdomen. Id. The autopsy classified the death as a homicide. Id. An investigation by law enforcement did not identify the individual or individuals who caused the blunt force injury to the patient. Id. The third incident involved a patient who suffered severe internal injuries after being attacked by another patient, an investigation revealed that a RCA provoked the attack on the patient. Id.

had no documentation that they received the required amount of annual training. Id. at 19. A follow up, performed twenty months later, revealed that MPC failed to comply with the audit's initial recommendations in regard to ensuring that direct care staff received required training. *Id.*, Ex. 3 at 5-6.

### III. Law & Analysis

#### A. Standard of Review

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.,* 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (citing *Anderson*, 477 U.S. at 252).

B. Qualified Immunity

Qualified immunity is a privilege granting immunity to government officials performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In resolving the issue of qualified immunity on summary judgment, courts are required to engage in a two-step decisional process: (1) whether the plaintiff has shown sufficient facts to make out a violation of a constitutional right; and (2) whether the constitutional right was "clearly established" at the time of the alleged misconduct. *Pearson v. Callahan*, 129 S.Ct. 808, 815-16 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 121 (2001)). "The relevant, dispositive inquiry in

determining whether a right was clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Klein v. Long*, 275 F.3rd 544, 550 (6th Cir. 2001) (quoting *Saucier*, 533 U.S. at 121 S.Ct. 2151, at 2156). The plaintiff bears the ultimate burden of proving "that the defendant's conduct violated a right so clearly established that a reasonable official in his position would have clearly understood that he or she was under an affirmative duty to refrain from such conduct." *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002). A district court enjoys "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S.Ct. at 818.

  C. <u>Plaintiff's Claims</u>

   1. <u>Substantive Due Process</u>

    a) <u>Excessive Force</u>

At the outset, the court notes that plaintiff incorrectly invokes the protections of the Fourth and Eighth Amendments in support of his § 1983 claims. At the time of the alleged constitutional violations, plaintiff was a pretrial detainee[4] and not a convicted prisoner. Plaintiff was involuntarily committed to the MPC after he was charged with various crimes and found to be incompetent to stand trial. The Sixth Circuit Court of Appeals has held "which amendment applies depends on the status of the plaintiff at the time of the incident, whether free citizen, convicted prisoner, or something in between." *Lanham v. Hinson*, 529

---

[4] A pretrial detainee "is a person lawfully committed to pretrial detention [who] has not been adjudged guilty of any crime. He has only a judicial determination of probable cause as a prerequisite to the extended restraint of his liberty following arrest." *Bell v. Wolfish*, 441 U.S. 520, 536 (1979).

F. 3d 673, 680 (6th Cir. 2008). Because plaintiff was a pretrial detainee, his constitutional rights derive from the Fourteenth Amendment's Due Process Clause, rather than from the Fourth or Eighth Amendments to the United States Constitution. See *Leary v. Livingston County*, 528 F. 3d 438, 443 (6th Cir. 2008). The *Leary* court noted:

> Because Leary is a pretrial detainee, he brings his excessive-force claim against [defendant] under the Fourteenth Amendment's Due Process Clause, which protects a pretrial detainee from the use of excessive force that amounts to punishment. By contrast, convicted prisoners may bring excessive-force claims under the Eighth Amendment, and free citizens may bring such claims under the Fourth Amendment.

*Id.* (internal citations omitted); *see also, Harris v. City of Circleville*, 583 F. 3d 356, 365 (6th Cir. 2009) ("[T]he Due Process Clause protects a pretrial detainee from 'excessive force that amounts to punishment.'"). "The substantive component of the Fourteenth Amendment due process protects citizens against conduct by law enforcement officers that 'shocks the conscience.'" *United States v. Budd*, 496 F. 3d 517, 529 (6th Cir. 2007) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)).

As to plaintiff's claim that defendant-resident care aids Sheets, Abraham, Borie, Hassenger, and Cooper used excessive force against him, it remains an open question in this circuit whether an excessive force claim under the Fourteenth Amendment utilizes the same standard applicable to Eighth Amendment excessive force claims. See *Griffin v. Hardrick*, 604 F. 3d 949, 953 (6th Cir. 2010) ("The law is unsettled as to whether the analysis for a Fourteenth Amendment excessive-force claim and an Eighth Amendment excessive-force claim is the same."); *see also, Leary*, 528 F. 3d at 443; *see also, Wilson v. Williams*, 83 F. 3d 870, 875 (7th Cir. 1996) ("Since the protection of the Fourteenth Amendment extends beyond the prohibition of merely cruel and unusual punishment,

pretrial detainees must arguably be afforded a higher standard than that provided by the Eighth Amendment.") Because plaintiff does not argue that the potentially broader protections of the Fourteenth Amendment apply, the court will analyze plaintiff's excessive force claim under the same standard as an Eighth Amendment excessive force claim. *See Griffin*, 604 F. 3d at 953 (analyzing pretrial detainees excessive force claim under the Eighth Amendment standard).

A violation of the Eighth Amendment occurs if a government actor's use of force reflects an unnecessary and wanton infliction of pain. *Pelfrey v. Chambers*, 43 F. 3d 1034, 1037 (6th Cir. 1995). To determine whether a pretrial detainee's rights have been violated, this court must determine "whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* (citing *Hudson v. McMillian*, 503 U.S. 1 (1992)). Factors to be considered include: the need for application of force, the relationship between that need and the amount of force used, and the threat reasonably perceived by the responsible officials and any efforts to temper the severity of a forceful response. Hudson, 503 U.S. at 7.

Defendants maintain that they were simply doing their job and that plaintiff's injuries were the unfortunate result of good faith physical management techniques. Plaintiff argues that defendants are not entitled to qualified immunity arguing that "the severity of Matt's wounds; the testimony that he was kicked, punched, and choked; the excessive frequency and severity of the holds and restraints; the expert opinion of Dr. Spitz and the author of the ORR Report;[5] and the fact that Matt did not need such rough treatment and abuse at

---

[5] Plaintiff mistakenly refers to exhibit 25 as an ORR report. This document states: "My opinion would be that somebody kicked him . . . A knee in the back would

any other home all create a genuine issue of material fact." *See* Resp. Br. at 17. However, plaintiff fails to provide sufficient admissible evidence for this court to conclude that a genuine issue of material fact exists as to whether his constitutional rights were violated by the defendants' excessive use of force.

Plaintiff cannot rely on the expert opinion of Werner U. Spitz, a forensic pathologist, who has opined that "the injuries resulted from blunt force trauma consistent with the use of excessive force . . . the rib fractures showed evidence of fragmentation which is evidence of excessive force and brutality [and] were not sustained by a fall or repeated falls." Plaintiff attached a letter written by Dr. Spitz as an exhibit to his response brief. This is inadmissible hearsay and cannot be considered when ruling on a motion for summary judgment. *See Wiley v. United States*, 20 F. 3d 222, 225-26 (1994). Plaintiff filed a sur-reply and included Dr. Spitz's affidavit to correct this deficiency in his proofs. Defendants filed a reply to plaintiff's sur-reply arguing that Dr. Spitz's affidavit should be stricken because plaintiff should have prepared and included it in his responsive pleading, rather than in a sur-reply.

Plaintiff asserts that "[b]y way of oversight of the undersigned alone, the statement was not provided in affidavit form. . . . The statement is no different from the copy originally submitted in Plaintiff's Response Brief, the form alone has been changed to address Defendant's hearsay concerns." The date of Dr. Spitz's letter is April 15, 2011 and his

---

not do it." This document appears to be a staff nurse's notes written down "Per Dr. Fischre" on December 16, 2008. It is unknown who the author of these notes are or when they were written. Further, the notes contain hearsay. Therefore, the court cannot rely on this evidence in resolving the pending motion for summary judgment. *See Wiley v. United States*, 20 F. 3d 222, 225-26 (1994).

-14-

affidavit is dated August 12, 2011, filed the day after defendants filed their reply brief. Certainly, plaintiff had ample time to prepare Dr. Spitz's affidavit prior to the conclusion of the briefing schedule on defendant's motion for summary judgment, particularly in light of the fact that the court extended the briefing schedule permitting plaintiff to file his response on July 28, 2011 rather than June 30, 2011. *See* Dkt. No. 90. Attorney neglect offers no basis upon which this court can allow plaintiff to add to the record after the time for submitting briefs has concluded. As a result, Dr. Spitz's affidavit is stricken.

This leaves plaintiff's deposition testimony as the only admissible evidence submitted to demonstrate that a material question of fact exists. However, plaintiff's deposition testimony reveals that he is unable to demonstrate what each defendant did to violate his constitutional rights. *Terrance v. Northville Regional Psychiatric Hospital*, 286 F. 3d 834, 843 (6th Cir. 2002). The *Terrance* court noted that:

> This court has consistently held that damage claims against governmental officials alleged to arise from violations of constitutional rights cannot be founded upon conclusory, vague or general allegations, but must instead, allege facts that show the existence of the asserted constitutional rights violation recited in the complaint and what each defendant did to violate the asserted right.

*Id.* at 842. During his deposition, plaintiff testified that Abraham, "kicked me in the ribs. He would throw my face into the floor like this." *See* Plf.'s Mot. for Summ. J., Ex. 23 at 8. Plaintiff also testified that Cooper knocked his tooth out and would pick plaintiff up and swing him around and try to knock him to the floor. *Id.* at 9, 24. Plaintiff further described that Sheets would hit him in the eye, Borie choked him and Hassenger would watch him when he was in restraints. *Id.*, at 23-24. This is the extent of plaintiff's testimony concerning defendants' conduct. It is unclear which defendant caused which injury alleged in the

complaint, the precise date the injury occurred or how each injury was sustained. For instance, when plaintiff went to the Mount Pleasant Police Department, he identified defendants Abraham, Borie, Hassenger and Sheets as the individuals who caused his rib fractures. However, at his deposition, he named only defendant Abraham in connection with his rib injuries. Further, the progress notes from February 20, 2008, the date plaintiff alleges Abraham kicked him in the ribs, state that plaintiff was acting aggressively toward staff and harming himself by throwing himself to the floor and scratching his face. Additionally, the complaint alleges that defendants Hassenger and Borie punched plaintiff in the face on February 13, 2009, knocking his tooth loose. This is contrary to plaintiff's deposition testimony as he testified that defendant Cooper knocked his tooth loose. Furthermore, defendants have submitted documentation demonstrating that defendant Borie was not working at the MPC on February 13, 2009. Thus, plaintiff's deposition testimony fails to provide sufficient factual detail to create a question of fact. Plaintiff has not presented any evidence to show that his injuries were the product of defendants' conscious shocking conduct and not the unfortunate result of good faith physical management techniques on a resident who actively and physically resisted their attempts to control his behavior. Defendants are entitled to qualified immunity.

  b) <u>Deliberate Indifference to Serious Medical Injuries</u>

Plaintiff also alleges that his Fourteenth Amendment rights were violated by defendants deliberate indifference to his serious medical needs. Claims brought by pretrial detainees alleging deliberate indifference are analyzed under the Fourteenth Amendment's Due Process Clause, rather than under the Eighth Amendment. See <u>Bell</u> v. <u>Wolfish</u>, 441 U.S. 520, 535 n. 16 (1979). However, the standard of review for a due process claim is identical to an Eighth

Amendment denial of medical care claim. See Barber v. City of Salem, 953 F. 2d 232, 235 (6th Cir. 1992); Roberts v. City of Troy, 773 F. 2d 720, 723 (6th Cir. 1985).

The Sixth Circuit Court of Appeals employs a two part test to analyze claims of deliberate indifference. Estate of Carter v. City of Detroit, 408 F. 3d 305, 311 (6th Cir. 2005). Specifically, plaintiff must satisfy a subjective and objective test to make out his claim. The objective prong requires a demonstration that plaintiff was exposed to a sufficiently serious risk of harm. See Farmer v. Brennan, 511 U.S. 825, 834 (1994). The subjective component requires that the defendants knew of and disregarded a substantial risk of serious harm to the detainee's health and safety. Id. at 835-37; see also, Terrance v. Northville Regional Psychiatric Hospital, 286 F. 3d 834, 843 (6th Cir. 2002). It is not enough if the official should objectively have been aware of the risk to the detainee's health and safety, rather "[t]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.

In their motion, defendants do not argue that plaintiff was not exposed to a sufficiently serious risk of harm, or that his injuries were not serious. Rather, defendants maintain they were unaware of the risk to plaintiff's health and safety. Plaintiff fails to provide evidence that defendants were aware of and disregarded a serious risk to plaintiff's health. For instance, plaintiff argues that he began complaining of pain in his rib area on December 1, 2008 but was not taken for x-rays until December 12, 2008. However, plaintiff has presented no evidence that defendants Hassenger, Borie, Sheets, Abraham and Cooper were aware of his complaints. Plaintiff alleged that defendants Hassenger and Borie punched him in the face, knocking his tooth loose on February 13, 2009. However, defendant Borie was not working at the MPC on this date, and plaintiff failed to identify defendant Hassenger as the individual

responsible for his missing tooth at his deposition. Plaintiff never testified, or presented any other evidence that he complained about his loose tooth to any of the named defendants until February 17, 2009, which is the date he was seen by a dentist. Plaintiff has failed to bring forth any evidence that defendants were aware of, and disregarded his serious medical needs. Defendants are entitled to qualified immunity.

### c) Supervisor Liability

During the relevant time period, defendant Kelly was Director of Hospital and Center Care Operations and defendant Pullins served as Acting Director of the MPC. There can be no § 1983 liability under a theory of respondeat superior, proof of personal involvement is required for a supervisor to incur personal liability. *See Taylor v. Mich. Dep't Corr.*, 69 F. 3d 76, 80-81 (6th Cir. 1995). In order for Pullins and Kelly to be found liable, they must both be aware of a substantial risk of harm and must also draw the inference. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Both defendants Kelly and Pullins testified that they had no direct involvement in plaintiff's care, and that they learned of plaintiff's complaints through the ORR, which found plaintiff's complaints to be unsubstantiated. Plaintiff presents no evidence to the contrary. Therefore, defendants Kelly and Pullins are entitled to qualified immunity.

### 2.    Equal Protection

Plaintiff argues that he has stated an equal protection claim based on a "class of one" theory. To prevail on this claim, plaintiff must show that other patients at MPC were "similarly situated in all relevant respects." Rondigo, L.L.C. v. Twp. of Richmond, 641 F. 3d 673, 682 (6th Cir. 2011). Additionally, plaintiff must also show that defendants' adverse treatment "was so unrelated to the achievement of any combination of legitimate purposes that the court can

only conclude that the government's actions were irrational." Id. The second prong can be demonstrated by showing the conduct in question was motivated by animus or ill-will. See Warren v. City of Athens, 411 F. 3d 697, 711 (6th Cir. 2005).

Defendants argue that plaintiff has failed to provide any evidence that he was treated differently than others who are similarly situated in all relevant respects. Rather, plaintiff argues that staff at the MPC mistreated other patients as well. Plaintiff does not address this argument in his response brief. Therefore, the court concludes that plaintiff has not set forth sufficient facts to demonstrate that defendants violated his equal protection rights. This claim is dismissed.

### 3. State Law Claims

Defendants argue that the court should dismiss plaintiff's state law claims based on public employee immunity. However, supplemental jurisdiction over state law claims should be declined when all federal claims are dismissed before trial. See United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966).

### IV. Conclusion

Defendants' motion for summary judgment is GRANTED IN PART.

Plaintiff's 42 U.S.C. § 1983 claims are dismissed.

Plaintiff's state law claims are dismissed without prejudice.

SO ORDERED.

Dated: March 22, 2012

                                            s/George Caram Steeh
                                            GEORGE CARAM STEEH
                                            UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on March 22, 2012, by electronic and/or ordinary mail.

s/Josephine Chaffee
Deputy Clerk